Filed 1/29/14  In re A.J. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re A.J. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>AR.J.,<br><br>        Defendant and Appellant;<br><br>A.J. et al.,<br><br>        Respondents. | C072132<br><br>(Super. Ct. Nos. J05760, J05761) |

Appellant Ar.J., father of the minors A.J. and An.J., appeals from the juvenile court's jurisdictional and dispositional orders.  (Welf. & Inst. Code, §§ 360, subd. (d),

1

395.)[1]  He contends the juvenile court improperly denied reunification services based on a flawed finding of severe sexual abuse.  Ample evidence of severe sexual abuse was presented at the jurisdictional hearing and the juvenile court correctly relied on this evidence in making its dispositional findings and orders.  Accordingly, we affirm the judgment.

BACKGROUND

*The Initial Complaint and Investigation*

The San Joaquin County Human Services Agency (Agency) filed a dependency petition alleging failure to protect and sexual abuse (§ 300, subds. (b), (d)) in July 2011 after 16-year-old A.J. reported to her paternal aunt that father had sexually abused her since she was nine.  The minors were placed in the paternal aunt's care.

Father was a Penal Code section 290 sex offender registrant, having been previously convicted of molesting A.J.'s mother, K.J., when father was 25 and K.J. was 13.

A.J. told investigators father put his penis inside her only a little so she would remain a virgin.  She said his penis would be inside her "probably about an hour."  He also taught her how to perform oral sex on him.  Father had threatened to kill her if she told anyone and put a knife to her throat numerous times.

Father also used a purple vibrator on her private parts, and videotaped her masturbating many times.  He would put her on a black table with stirrups where she would masturbate while he videotaped.  According to A.J., father had a tattoo on his penis of a white eyeball but the ink had faded.  He also molested her mother, K.J., when K.J. was 13 and A.J.'s friend, Crystal.  A.J. did not think father molested An.J.

---

**1**      Undesignated statutory references are to the Welfare and Institutions Code.

Father voluntarily showed a detective his penis, which was not tattooed.  He admitted buying a table for doing tattoos about two weeks ago, but did not know it had stirrups until he took the table home.  He believed A.J. was having a sexual relationship with her half brother Anthony, who was staying at the same apartment complex as the paternal aunt.  Father thought she made up the allegations so she could be closer to her half brother.  A.J. told investigators she was close with Anthony, but they were "completely just brother and sister."

An.J.'s mother, J.J., lived in Utah.  She sent An.J. to live with father after Children's Protective Services in Utah received reports that An.J. suffered from constant head lice and there was possible drug use in the house.

The minors were detained in July 2011.

The March 2012 jurisdictional report noted A.J. could not count the number of times father touched her private parts, but it was "very often."  The last time he molested her was about a week before she told her aunt, when father put her on the couch, took her clothes off, and began to have intercourse with her.

Officers searching father's van found a purple vibrator.  Numerous letters, cards, and notes from A.J. to father in which she expressed her love for him were appended to the report.

In March 2012, the Agency filed a second amended section 300 petition on behalf of An.J. alleging she was at risk of sexual abuse due to father's sexual abuse of A.J.

### *The Jurisdictional Hearing*

The juvenile court conducted an extensive jurisdictional hearing on the petitions between March 5, 2012, and April 10, 2012, hearing testimony from 15 witnesses.

3

A.J. testified that father started touching her when she was seven. He taught her how to perform oral sex by putting her mouth over his private parts. He would put his penis about "half" into her vagina. It hurt every time. Father also used on her a purple dildo that vibrated, and had a cord that turned it on and off. It was kept in a plastic bag, in a closet above the garage. Father used it on her more times than she could count.

"White stuff" went out of his penis and into her vagina when he had intercourse with her. It went on a blanket when she performed oral sex on him. Father used lubricating gel, which was stored with the dildo, to make intercourse easier for her.

Father usually would not allow her to go places other than school. He had her homeschooled starting her freshman year. Father told her not to tell anyone about the relationship, and threatened to kill her if she did. He used a knife and a gun to threaten her.

During a slumber party at her aunt's house, A.J. felt it was the right time to tell someone what was happening. She told her aunt about father touching her inappropriately.

Father's genital area was shaved and looked like a "mushroom." He had a tattoo on the tip of his penis that looked like an eyeball. The white part of the tattoo would fade but the black circle was always there.

While A.J. did not think father molested An.J., he did molest A.J.'s friend, Crystal. Crystal was 12 or 13 years old at the time, but later denied being molested.

A.J. was videotaped touching herself. She was naked, and father would start the camera and then leave the room. It started when she was 12 or 13. She watched the videos with her father a few times.

4

A.J. identified a photograph of the purple dildo father used on her. She also identified a tattoo bed with stirrups where "sexual things" occurred. Before that, it would happen on the floor.

A.J. loved her dad. She testified extensively about letters she had written, primarily to her father. She said nice things to him in the letters, but they were made up so he would treat her better.

Dr. Anthony Urquiza gave expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) and false allegations associated with the syndrome.

He explained five characteristics that, according to the CSAAS theory, often occur in children who have been sexually abused: (1) secrecy; (2) the victim's feeling of helplessness; (3) the victim's feeling of entrapment and attempts to cope by accommodation; (4) delayed or unconvincing disclosure of the abuse; and (5) retraction. Meeting the criteria does not determine whether the child had been abused.

Dr. Urquiza met with A.J. twice and once with An.J. An.J. was having "severe problems with masturbation," which distressed her caretaker because it happened frequently and everywhere. She showed some moderate symptoms of anxiety, anger, aggression, and depression.

A.J. was "extremely high in most of the scales that included trauma, depression, anxiety, aggression, defiance." She showed many "elevated symptoms or characteristics related to some type of traumatic experience or trauma symptoms." She likely met the clinical diagnosis for posttraumatic stress disorder (PTSD).

The parties stipulated the vibrator contained DNA from A.J. and DNA from father's semen.

The paternal aunt testified that father was initially hesitant to let A.J. attend the slumber party. A.J. started screaming, "call the police" in the bathroom. She said father had touched her inappropriately and she did not want to return home.

According to the paternal aunt, A.J. said several people touched her or tried to touch her inappropriately. At some point, the aunt no longer believed A.J. A.J. eventually started to cry for her dad. She also engaged in very promiscuous behavior while living with the paternal aunt, and lied to her "[a]ll of the time."

Father presented several witnesses who testified that he and A.J. acted appropriately together, like father and daughter.

The social worker assigned to the case testified that A.J. complained no matter where she was placed, and she ran away from two or three foster homes. A.J. sometimes lied to the social worker and tried to manipulate her. A.J. had been identified as having PTSD.

Father also presented the expert testimony of Dr. William O'Donohue on child sexual abuse and sexual abuse allegations. He opined that CSAAS was "junk science" because it has the trappings of science but the theory has not been tested on sexually abused children to see if the theory fits.

When determining whether an allegation was true, he looked for "consistency in core details." Dr. O'Donohue would look for grooming, and threatening or bribing the victim not to tell, and for a diagnosis of PTSD. Isolation and secrecy is another characteristic of molestation; it is not typical to molest a child while another child is sleeping next to them. A victim typically would not write positive letters to the perpetrator. If the purple vibrator described by A.J. "had both father's sperm on it and minor's DNA on it," it would help him resolve any of the inconsistencies in the case.

6

The juvenile court sustained the petitions. The court found some of A.J.'s claims were "very difficult to believe," which was "not unusual." Nonetheless, the juvenile court believed the minor "in some way." While the sexual abuse did not happen on every occasion described by her, it happened "on more than one occasion." The juvenile court emphasized the DNA evidence and the lubricant found with the vibrator, as well as A.J.'s diagnosis of PTSD.

Summing up, the juvenile court stated: "So, I base my decision, my finding on the requirements here by a preponderance of the evidence. Is it beyond a reasonable doubt? I can't say that. I wouldn't want to make that stretch. Why law enforcement has not made, gone forward, I won't make comments based on what they do or don't do." In sustaining the petitions, the juvenile court found "more than sufficient factual basis" for the allegations.

### The Dispositional Hearing

In the June 2012 dispositional report, the Agency recommended denying services to father and A.J.'s mother, with services for An.J.'s mother.

No additional evidence was presented at the September 2012 dispositional hearing. The juvenile court found by clear and convincing evidence that A.J. "had been sexually abused or is in substantial danger of being sexually abused," she "has been adjudicated a dependent child of the Juvenile Court of San Joaquin County as a result of severe sexual abuse by the father," and services would not benefit either child. The juvenile court accordingly denied reunification services for father as to both minors pursuant to section 361.5, subdivision (b)(6).

7

DISCUSSION

Father's sole contention is that the juvenile court's jurisdictional findings precluded it from denying reunification services pursuant to section 361.5, subdivision (b)(6).

Section 361.5, subdivision (b)(6), provides that the juvenile court may deny reunification services if the court has found by clear and convincing evidence that "the child has been adjudicated a dependent . . . as a result of severe sexual abuse [defined as including but not limited to sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact between the parent and the child or a sibling] to the child, a sibling, or a half sibling . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent."

Father argues section 361.5 requires the juvenile court to find severe sexual abuse by clear and convincing evidence. We agree. (See *In re Rebekah R.* (1994) 27 Cal.App.4th 1638, 1651 [juvenile court must make independent finding of severe harm before denying reunification services].)

Father then claims the juvenile court "barely found" a preponderance of the evidence to sustain the petition at the jurisdictional hearing.[2] He notes the juvenile court identified several instances where A.J.'s credibility was questionable. He also claims "the evidence was less than clear and convincing in this case."

Father recognizes that sexual intercourse can support a finding of severe sexual abuse under section 361.5, subdivision (b)(6), and the juvenile court made such a finding at the jurisdictional hearing. According to father, this finding, made by a

---

**2**     The juvenile court must find the jurisdictional facts by a preponderance of the evidence. (§ 355.)

8

preponderance of the evidence at the jurisdictional hearing, cannot support the finding by clear and convincing evidence required to deny reunification services under section 361.5. From this, father concludes the juvenile court did no more than engage in a "bootstrap operation" and "legal hocus-pocus" by "[i]dentifying a jurisdictional finding of sexual intercourse as the legal equivalent of clear and convincing evidence of severe sexual abuse."

Here, the juvenile court conducted an extensive jurisdictional hearing and made detailed findings. While it identified problems with the Agency's case, the juvenile court ultimately found A.J. was credible and father had sexually abused her. Sustaining the jurisdictional allegations by a preponderance of the evidence, the juvenile court indicated the evidence would likely not satisfy the reasonable doubt standard, and did not address the clear and convincing standard.

Given the extensive testimony at the jurisdictional hearing, the parties declined to submit additional evidence at the dispositional hearing. In making the dispositional findings, the juvenile court relied on the evidence presented at the jurisdictional hearing. The juvenile court paraphrased the statutory language, finding "by clear and convincing evidence" that "the minor has been adjudicated a dependent child of the Juvenile Court of San Joaquin County as a result of severe sexual abuse by the father." "The fact that the juvenile court had earlier made jurisdictional findings on some of the same evidence using a preponderance of the evidence standard does not impugn the validity of the subsequent dispositional findings." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1230.) Viewing the evidence in the manner most favorable to the judgment, we conclude the dispositional findings were supported by substantial evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

9

Since the jurisdictional findings did not preclude a later finding of severe sexual abuse by clear and convincing evidence, the juvenile court did make such a finding at the dispositional hearing, and that finding is supported by substantial evidence, the juvenile court did not err in denying father reunification services pursuant to section 361.5.

## DISPOSITION

The judgment is affirmed.

        HOCH        , J.

We concur:

        ROBIE        , Acting P. J.

        BUTZ        , J.

10